## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | |
|---|---|
| LORI RAYBORN | CIVIL ACTION NO: 13-3014 |
| VERSUS | JUDGE DONALD E. WALTER |
| BOSSIER PARISH SCHOOL SYSTEM et al | MAGISTRATE JUDGE HAYES |

### MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment [Doc. #34] filed by Defendants,

Bossier Parish School Board ("BPSB"), Nichole Bourgeois ("Principal Bourgeois"), Ginger

Hughes ("Ms. Hughes"), and ACE American Insurance Company ("ACE"). Pursuant to 42

U.S.C. § 1983, Plaintiff Lori Rayborn ("Nurse Rayborn" or "Plaintiff") filed the instant lawsuit,

related to her employment with BPSB as a school nurse, alleging violations of her rights under

the First and Fourteenth Amendments to the United States Constitution, as well as Louisiana

law. Plaintiff opposes the instant motion. [Doc. #53]. For the reasons assigned herein,

Defendants' motion for summary judgment [Doc. #34] is **GRANTED**.

### BACKGROUND FACTS[1]

In approximately 2004, Nurse Rayborn began her employment with BPSB, as a school

nurse, originally assigned to Sun City Elementary, Rusheon Middle, and Parkway High Schools.

For purposes of this case, until January 2013, she was assigned to Curtis Elementary and

Parkway High Schools. At all times pertinent herein, Principal Bourgeois was employed by

BPSB as Principal of Parkway High School, and Ms. Hughes was BPSB's Nurse Coordinator

---

[1] *See generally* Statements of Material Facts Not in Dispute [Docs. ##34-4, 53-8], unless otherwise noted.

and Nurse Rayborn's immediate supervisor. Nurse Rayborn's duties and responsibilities as a Professional School Nurse were established by a written job description and included, *inter alia*: maintaining complete records on all school nurse activities; administering medication; generating students' health care plans; and medical training of unlicensed, non-medical staff, including school secretaries and para-professionals.[2] Prior to August 2012, it is undisputed that Nurse Rayborn was a good employee, with no disciplinary record and consistently satisfactory performance evaluations.[3]

On May 20, 2011, a sophomore student ("H.D.C.") at Parkway High School committed suicide. H.D.C. was an insulin-dependent diabetic, with whom Nurse Rayborn was familiar, and for whom Nurse Rayborn had prepared a Health Care Plan, to address her diabetic needs at school. As a result of H.D.C.'s suicide, her family commenced litigation against BPSB, alleging, *inter alia*, that BPSB knew that H.D.C. was being bullied and harassed at school and failed to prevent her suicide.[4] H.D.C.'s nursing records, maintained by Nurse Rayborn, were subpoenaed.[5] It is undisputed that there is no mention therein of any discussions, with either H.D.C. or her mother, regarding bullying or suicide.

Nurse Rayborn was notified of the subpoena on March 20, 2012; she provided H.D.C.'s medical records to Ms. Hughes on March 21, 2012; and, on March 22, 2012, Nurse Rayborn met

---

[2] Doc. # 34-13, p. 41; Doc. #34-10, pp. 30-35; Doc. # 34-9, pp. 12-13.

[3] Doc. #53-3, pp. 2 and 9; *see also* Doc. # 34-5, pp. 81-89 (evaluations).

[4] Doc. # 53-4.

[5] Doc. #1, p. 3, ¶¶ 8-9.

2

with Principal Bourgeois to review the records before they were furnished to the attorneys.[6] During these meetings, Nurse Rayborn discussed with both Defendants her concerns regarding what she deemed to be "red flags" in H.D.C.'s nursing records. Included in Nurse Rayborn's concerns are the following notes or incidents.

According to Nurse Rayborn, H.D.C. and her mother had unsuccessfully requested, with Nurse Rayborn's recommendation, a "504 plan."[7] Plaintiff maintains that H.D.C. was entitled to, but denied, 504 accommodations.[8] Parkway counselor Martha Lee testified that she never denied a 504 request nor received a 504 referral for a diabetic student.[9] Prior to the nursing records being subpoenaed, Ms. Hughes claims to have never had any discussions with Nurse Rayborn regarding H.D.C. or any accommodations related to her treatment at school.[10]

In March 2011, the records reflect that H.D.C. expressed some concern, after being approached by the yearbook committee to participate in a proposed article on students who had overcome health issues. Nurse Rayborn and Parkway Assistant Principal Becky Gray intervened with the yearbook teacher and confirmed that H.D.C. would not participate or share any health information with the yearbook committee.

On May 2, 2011, the records reflect that H.D.C. complained to Nurse Rayborn that a

---

[6] Doc. #1, p. 3, ¶ 10; p. 4, ¶¶ 11-12; and p. 5, ¶ 13.

[7] The term "504," used in relation to accommodations or plans, refers to Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination against individuals with disabilities. *See* 29 U.S.C. § 794.

[8] *See* Doc. # 53-2, pp. 2-6; Doc. # 34-10, pp. 58-59.

[9] Doc. # 34-8, pp. 18-20.

[10] Doc. # 34-5, pp. 55-56.

substitute teacher was improperly disallowing glucose monitoring in the classroom. Nurse

Rayborn discovered that the substitute teacher had not been supplied with a copy of H.D.C.'s

Health Care Plan, despite Nurse Rayborn having emailed H.D.C.'s plan to her teachers with this

instruction: "PLEASE DO NOT STORE STRICTLY IN YOUR COMPUTER. A PRINTED

HARD COPY IS NEEDED FOR ACCESSIBILITY FOR SUBSTITUTES."[11] In response, Nurse

Rayborn advised both the substitute teacher and the front office secretary, Michelle Barger, that

the school is legally required to allow H.D.C., as a diabetic student, to monitor her glucose

without restrictions or limitations.

H.D.C. had been consistent and compliant in addressing her diabetic care, until she

experienced what Nurse Rayborn describes as a "sudden, unusual, and uncharacteristic" change,

prior to her May 2011 suicide.[12] In reviewing the nursing record, Nurse Rayborn was concerned

that H.D.C.'s abnormal non-compliance with her diabetic care appeared to be contemporaneous

with allegations of her being bullied at school.[13] For instance, the records reflect that, in April

2011, Nurse Rayborn treated H.D.C. for high glucose levels, at which time she discovered that

H.D.C. had been intentionally non-compliant with her diabetic care. Thereafter, Nurse Rayborn

contacted H.D.C.'s mother to discuss her non-compliance and to recommend diabetic counseling

and a follow-up with H.D.C.'s doctor. It is Nurse Rayborn's opinion that H.D.C.'s erratic blood

sugar levels, recorded prior to her death, could have indicated that H.D.C. was experiencing

_____

[11] Doc. #53-8, p. 3, ¶ 17; Doc. #53-5, pp. 45-73.

[12] Doc. # 34-10, pp. 43-44.

[13] Parkway Guidance Counselor, Pat Falting, recalls one instance, in which H.D.C. complained about a classmate and Falting reported same to Parkway Assistant Principal Gray. [Doc. # 34-7, p. 13]. However, Assistant Principal Gray denies any awareness of H.D.C.'s non-compliance with her diabetic care or that H.D.C. was being bullied. [Doc. # 34-6, pp. 15-16].

4

increased stress.[14] The final entry, prior to H.D.C.'s death on May 20, 2011, reflects that she again reported a high glucose level on May 12, 2011, for which she was provided water and later denied any signs or symptoms.

Nurse Rayborn alleges that, after their March 2012 meeting, Principal Bourgeois' demeanor changed, such that Principal Bourgeois became openly hostile toward Nurse Rayborn and encouraged similar hostile and harassing behavior from the main office secretary, Ms. Barger.[15] In mid-August 2012, there was a verbal confrontation between Nurse Rayborn and Ms. Barger, in Parkway's main office, for which students, parents and school staff were present. According to Nurse Rayborn, she confronted Ms. Barger to inform her that she believed the administration to be in violation of Louisiana law, for failing to properly maintain student medical records and mixing the students' current and previous years' medications. Thereafter, Principal Bourgeois counseled both Ms. Barger and Nurse Rayborn regarding their inappropriate behavior.

Following that confrontation, a meeting was held in late August 2012, at which the following individuals were present: Principal Bourgeois, Nurse Rayborn, Assistant Principal Gray, Ms. Barger, and another main office secretary, Staci Kendall. There is some dispute over why this meeting was called and what exactly transpired. Principal Bourgeois testified that the meeting was precipitated by the above confrontation and intended to address communication concerns between Nurse Rayborn and Parkway's office staff, including Nurse Rayborn's

---

[14] Doc. # 34-11, pp. 3-6.

[15] Doc. #1, p. 5, ¶¶ 14, 15; p. 6, ¶ 18.

5

previous requests that the staff refrain from calling her personal cell phone.[16] To resolve any confusion surrounding emergency communications, a 911 policy was established, setting a clear directive to call 911, regardless of whether a nurse was present, for any on-campus medical emergency.[17] Nurse Rayborn claims to have expressed concern about this policy, as effectively excluding her, as a licensed first responder, and endangering students, jeopardizing her nurse's license, and creating liability for the school.[18] At this meeting, Nurse Rayborn alleges that she also reported retaliatory harassment and intimidation she was experiencing "as a result of her opposing the situation involving [H.D.C.'s] suicide."[19] Allegedly, her protestations were ignored, and Principal Bourgeois eventually instructed her to leave the meeting.[20]

Consequently, on August 22, 2012, Ms. Hughes reprimanded Nurse Rayborn, at which time Nurse Rayborn claims to have "again reported the ongoing retaliatory harassment, intimidation, and hostile working environment" to Ms. Hughes.[21] Nurse Rayborn alleges that, in response, Ms. Hughes warned her that the negative relationship existing between her and Principal Bourgeois had arisen as a result of Nurse Rayborn "exposing" BPSB's "inadequacies"

---

[16] Doc. # 34-9, pp. 20-22; *see also* Doc. # 34-13, pp. 43-45.

[17] Doc. # 34-9, pp. 21-22; Doc. # 53-2, pp. 61-62.

[18] Doc. # 53-8, p. 4, ¶ 22; Doc. # 53-2, pp 61-62. Nurse Rayborn also complains that she had previously requested, but was denied, a two-way radio for emergency situations. Doc. #1, p. 6, ¶ 18; *see also* Doc. #34-6, p. 13; Doc. # 34-12, p. 81; and Doc. # 1, p. 8, ¶ 24.

[19] Doc. # 1, p. 6-7, ¶ 19.

[20] *Id.*

[21] Doc. # 1, p. 7, ¶ 20. Principal Bourgeois testified that she is not responsible for the nursing staff and has never requested that Nurse Rayborn be reprimanded. *See* Doc. # 34-9, pp. 7-8, 24.

when her nursing records were subpoenaed.[22] Nurse Rayborn claims that Ms. Hughes threatened to reassign her if she didn't find a way to deal with and rise above the negativity, as the negativity could potentially hurt the nursing department as a whole.[23] Ms. Hughes testified that this "counseling session" with Nurse Rayborn lasted "[a] few hours."[24]

A few months later, on January 28, 2013, a male student at Parkway passed out during the lunch hour. Assistant Principals, Becky Gray and Lorenza Baker, responded and requested that the staff call 911. Emergency medical personnel arrived within five minutes. After 911 was called, two different para-professionals notified Nurse Rayborn of the medical situation. Later that afternoon, Nurse Rayborn inquired of Principal Bourgeois why she was not called to help, despite being on campus when 911 was contacted to handle the medical emergency. In response, Principal Bourgeois referred her to the 911 practice, established at the August 2012 meeting. Nurse Rayborn claims to have reiterated to Principal Bourgeois her concerns, regarding child welfare and safety at Parkway, "including the mishandling of student medical emergencies, an intentional exclusion of a licensed medical provider [Plaintiff] and first responder, intentional child endangerment, and endangerment of [Plaintiff's] nursing license."[25] She left the principal's office upset.

The next day, on January 29, 2013, Nurse Rayborn met with Ms. Hughes, again for

---

[22] *Id.*

[23] *Id.*

[24] Doc. # 34-5, p. 64.

[25] Doc. # 1, p. 8, ¶ 22.

approximately "[a] few hours."[26] The parties disagree as to how this meeting unfolded. Nurse Rayborn claims that, prior to the meeting and at the request of Principal Bourgeois, Ms. Hughes had already prepared a reprimand and transfer for Nurse Rayborn to sign; however, Nurse Rayborn objected thereto, disagreed with the supporting allegations of insubordination, and refused to sign the reprimand. She further claims that Ms. Hughes, and her BPSB superiors, supported Nurse Rayborn's positions on student safety, but she admits that Ms. Hughes ordered her transfer on the basis of "insubordination."[27] Defendants claim that Ms. Hughes attempted to counsel Nurse Rayborn regarding her unprofessional and inappropriate behavior toward Principal Bourgeois, at which time Nurse Rayborn presented a draft letter of resignation. In response, Ms. Hughes suggested some language modifications and recommended that Nurse Rayborn give further consideration before resigning.[28] After a lengthy discussion, Ms. Hughes then informed Nurse Rayborn that she would be transferred, effective immediately, to Sun City Elementary and Elm Grove Middle Schools. An "informal written reprimand," dated January 29, 2013 and issued by Ms. Hughes, notes a "previous discussion," held "on August 22, 2012 concerning [Nurse Rayborn's] communication/relation with the administration at Parkway."[29]

---

[26] Doc. # 34-5, p. 65 (Ms. Hughes describing the conversation as lasting "[a] few hours.").

[27] Doc. # 53-8, p. 5, ¶ 24(a).

[28] Nurse Rayborn claims that her draft letter of resignation "specifically detailed that [Plaintiff] was being harassed in retaliation for reporting, opposing, and protesting the treatment of the student[,]" as well as "[Principal Bourgeois'] and [BPSB's] retaliatory harassment of her because of her protected activities." [Doc. # 1, p. 10, ¶ 26]. Plaintiff alleges that, after reviewing the letter, Ms. Hughes "ordered [Plaintiff] to remove the paragraph with 'volatile words' regarding ongoing harassment and bullying." *Id.* Plaintiff further alleges that "[Ms.] Hughes then directed her secretary to provide [Plaintiff] with a laptop . . . to retype the resignation letter[;]" however, Nurse Rayborn refused and did not submit the letter. *Id.*

[29] Doc. # 34-13, p. 49.

The reprimand refers to a "need for improvement in effective communication with school administration" and warns that continued difficulty therewith could result in a "formal reprimand" being "written and filed with Human Resources."[30]

After being transferred, Nurse Rayborn completed her 2013 spring semester assignments at Sun City Elementary and Elm Grove Middle. It is undisputed that neither her pay nor her benefits changed as a result of the transfer.[31] Nurse Rayborn claims that she filed both "Level 1" and "Level 2" grievances, through Red River United Teacher's Union ("the Union"). The first grievance was filed on February 5, 2013, and included allegations of "management abuse, child welfare, First Amendment [r]etaliation, licensure jeopardy, arbitrary and capricious treatment, and requested an investigation."[32] She received a response from BPSB's Human Resources Director, Myra Odum, on February 7, 2013, advising that no further action would be taken in response to her grievance.[33] On March 14, 2013, Nurse Rayborn filed another grievance, regarding narratives and notes being placed in her personnel file without her knowledge, in violation of La. R.S. 17:1234.[34] Thereafter, on March 20, 2013, Nurse Rayborn and a Union

---

[30] Id.

[31] Doc. #53-1, p. 15.

[32] Doc. # 1,  p. 11, ¶ 28.

[33] Doc. # 53-1, p. 16.

[34] Doc. # 53-1, p. 16. La. R.S. 17:1234(A) provides: "Each document concerning a school employee shall be placed in the employee's personnel file within a reasonable time and no document, except those resulting from routine recordkeeping, shall be placed in a school employee's personnel file by any school system employee, unless and until that school employee is presented with the original document and a copy thereof prior to its filing."

representative, met with Ms. Hughes and Ms. Odum.[35] Nurse Rayborn alleges that the complained-of notes were temporarily removed from her personnel file but ultimately replaced.[36]

Nurse Rayborn accepted full-time employment at Overton Brooks VA Medical Center in Shreveport, in early June 2013.[37] She submitted her formal letter of resignation to BPSB Superintendent Machen on July 22, 2013, on which date Nurse Rayborn alleges she was constructively discharged.[38] She claims that she was constructively discharged, through Defendants' hostility and collective indifference to her professional concerns and, ultimately, her involuntary transfer to an "undesirable" school. It is alleged that Defendants' hostility resulted from her turning over her subpoenaed nursing notes and protesting what she believed to be violations of state and federal law by Parkway's staff and administration.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) directs that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[39] A fact is "material" if it may affect the outcome of the

---

[35] *See* Doc. # 34-5, pp. 50-51 (Ms. Hughes recalls a meeting, requested by Plaintiff, for the purpose of viewing her personnel file); *but cf.* Doc. # 34-5, pp. 34-35 (Ms. Hughes denies having ever met with the Union, specifically during the 2012-2013 time period).

[36] Doc. # 1, p. 11, ¶ 30; Doc. # 53-1, p. 16.

[37] This fact is uncontested; however, Nurse Rayborn further states that school staff are allowed to engage in additional summer employment while still employed by BPSB. [Doc. #53-8, p. 5, ¶ 26(a)].

[38] Doc. # 34-13, p. 53 (resignation letter); Doc. # 53-1, p. 3; *see also* Doc. # 34-9, pp. 51-54 and 80-81 (Principal Bourgeois testified that she was notified of the resignation via a phone call from BPSB's Superintendent, and that she was "shocked and surprised" to learn that the letter of resignation contained allegations of, *inter alia*, retaliation, harassment, and humiliation).

[39] Rule 56 was amended effective December 1, 2010. Per the comments, the 2010 amendment was intended "to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting

suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict for either party. *Id.* The court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

The moving party bears the initial responsibility of informing the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309 (5th Cir. 1999). The moving party need not produce evidence to negate elements of the non-moving party's case, but need only point out the absence of evidence in support thereof. *Celotex Corp.*, 477 U.S. at 325; *Lawrence*, 163 F.3d at 311. Once the moving party carries its initial burden, the burden then falls upon the non-moving party to demonstrate the existence of a genuine dispute as to a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory or unsubstantiated allegations, or by a mere scintilla of evidence. *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). The non-moving party "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted).

---

summary judgment remains unchanged." Therefore, the case law applicable to Rule 56 prior to its amendment remains authoritative, and this court will rely on it accordingly.

### LAW AND ANALYSIS

Pursuant to 42 U.S.C. § 1983, Plaintiff, Nurse Rayborn, alleges that the actions and inactions of Defendants BPSB, Bourgeois and Hughes, violated her constitutional rights under the First and Fourteenth Amendments. Plaintiff claims that she was subjected to retaliation for disclosing and/or threatening to disclose Defendants' alleged failures to protect H.D.C., comply with laws applicable to diabetic students in the public school system, and properly handle student medical emergencies.[40] Plaintiff also alleges that Defendants violated Louisiana's anti-reprisal statute, Louisiana Revised Statutes § 23:967, and that Defendants' behavior constituted intentional infliction of emotional distress.

Title 42 U.S.C. § 1983 provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

"Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating already conferred federal rights." *Bauer v. Texas*, 341 F.3d 352, 357 (5th Cir. 2003) (citing *Albright v. Oliver*, 510 U.S. 266 (1994)). Thus, to state a claim under 42 U.S.C. § 1983, "a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). A plaintiff must also identify defendants who were personally involved or whose acts are causally

---

[40] Doc. # 1, p. 13, ¶ 36.

connected to the alleged constitutional violation. *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005) (citing *Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995)).

The parties agree that BPSB is a political subdivision of the State of Louisiana. Under Section 1983, municipalities and other local government units, such as school boards, are considered persons subject to liability. *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978). However, only official BPSB policy or custom could expose the school board to liability for constitutional rights violations. *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003). "Municipal liability under 42 U.S.C. § 1983 requires proof of 1) a policymaker; 2) an official policy; 3) and a violation of constitutional rights whose 'moving force' is the policy or custom." *Id.* (citations omitted). Municipal liability cannot merely be sustained under a theory of *respondeat superior. Id.* (citing *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997)).

To sustain a claim for municipal liability, the policymaker must have final policymaking authority. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "[W]hether a particular official has final policymaking authority is a question of *state law*." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (internal quotations omitted) (emphasis in original). Furthermore, "each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff[,]" in order for the necessary determination to be made on the policy's relative constitutionality. *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). In this case, Plaintiff has failed to identify any official school board policy or custom, much less show that any alleged violation resulted therefrom or was committed at the hand of an official with final policymaking authority under Louisiana law. *See Weathers v. Lafayette Par.*

*Sch. Bd.*, 520 F. Supp. 2d 827, 832 (W.D. La. 2007), *aff'd sub nom. Weathers v. Sch. Bd. of Lafayette Par.*, 281 F. App'x 428 (5th Cir. 2008). In light of those failures, Defendant BPSB is entitled to summary judgment on Plaintiff's § 1983 claims.

Principal Bourgeois and Ms. Hughes have both been named in this lawsuit in their individual and official capacities. While individual capacity suits seek to impose personal liability upon a governmental official for actions taken under color of state law, official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citing *Monell*, 436 U.S. at 690 n. 55). Accordingly, Plaintiff's § 1983 claims against Principal Bourgeois and Ms. Hughes, in their official capacities, are treated as claims against BPSB and must therefore be dismissed.

As to Plaintiff's claims against Principal Bourgeois and Ms. Hughes in their individual capacities, Defendants have alleged that they are entitled to qualified immunity. "This immunity protects all but the plainly incompetent or those who knowingly violate the law, so we do not deny immunity unless existing precedent must have placed the statutory or constitutional question *beyond debate*." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (citations and quotations omitted) (emphasis in original). "To overcome an official's qualified immunity defense, a plaintiff must show that the evidence, viewed in the light most favorable to [her], is sufficient to establish a genuine dispute '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 469 (5th Cir. 2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). The Court need not address the two prongs in any particular order, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); however, in this case,

14

Plaintiff fails to satisfy the first prong.

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *see also Lane v. Franks*, 134 S. Ct. 2369 (2014); *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968). As the Supreme Court has explained:

> *Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Garcetti*, 547 U.S. at 418 (2006) (citations omitted).

Plaintiff argues that she was speaking as a citizen on a matter of public concern when she submitted her nursing record, in response to a subpoena.[41] Plaintiff relies on *Lane v. Franks*, *supra*, which involved a government employee testifying in a criminal prosecution about fraud in the program in which he worked. *Lane* held that the First Amendment protects a public employee who provides truthful sworn testimony, compelled by subpoena, *outside* the scope of the employee's ordinary job responsibilities. *Lane, supra*, 134 S. Ct. at 2378-2381 (emphasis added).[42] *Lane* is distinguishable from *Garcetti*, *supra*, in which a prosecutor unsuccessfully

---

[41] Plaintiff's allegations of harassment and retaliation all stem from Defendants' behavior which allegedly began in response to Plaintiff turning over her subpoenaed nursing notes.

[42] Although the testimony in *Lane* was protected by the First Amendment, the retaliation claims were nonetheless dismissed on the basis of qualified immunity, as then-existing Eleventh Circuit and Supreme Court precedent was not sufficiently clear to preclude the employer's reasonable but mistaken

sought protection of a memorandum that was prepared to fulfill his responsibility of advising his supervisor on how best to proceed with a pending case. *Garcetti*, 547 U.S. at 421. The controlling factor in *Garcetti* was that the expressions were made pursuant to the prosecutor's official job duties. *Id.* In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* In *Garcetti*'s wake, *Lane* explicitly did not address "whether truthful sworn testimony would constitute citizen speech under *Garcetti* when given as part of a public employee's ordinary job duties[,]" because it was undisputed that the plaintiff-employee's ordinary job responsibilities did not include testifying in court proceedings. *Lane*, 134 S. Ct. at 2378 n. 4.

Here, Plaintiff primarily seeks First Amendment protection of her nursing notes, and subsequently, of what she generally describes as her protests and reports of Defendants' unlawful behavior. Although Plaintiff focuses on the fact that her nursing notes were subpoenaed, in order to analogize their constitutional status to that of the testimony protected in *Lane*, the Court is not persuaded. Plaintiff was a school nurse, whose duties and responsibilities were set forth in a written job description and included, *inter alia*, maintaining complete records on all school nurse activities.[43] Those activities, in turn, regularly included assessment and

---

belief that he could fire the employee for providing the testimony at issue. *Lane*, 134 S. Ct. at 2381-82.

[43] The Fifth Circuit has acknowledged that *"Garcetti* did not 'articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate.'" *Cutler, supra*, 767 F.3d at 472 (quoting *Garcetti*, 547 U.S. at 424). "After all, *Garcetti* 'did not explicate what it means to speak pursuant to one's official duties, although we do know that a formal job description is not dispositive ... [,] nor is speaking on the subject matter of one's employment.'" *Id.* (quoting *Williams v. Dall. Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007) (per curiam) (citations and

evaluation of individual student health and behavior patterns; conferences with teachers and parents; and routine follow-up on reported health concerns of students. Despite Plaintiff's personal belief that the subpoenaed notes contained "red flags" relevant to the litigation surrounding H.D.C.'s suicide, the fact remains that, as relevant to *this* litigation, Plaintiff maintained those notes to fulfill her work responsibilities. *See Garcetti*, 547 U.S. at 421-22 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen."). Having to turn over those notes, in response to a subpoena, does not place them beyond the reach of *Garcetti*. Thus, Plaintiff was not speaking as a citizen for First Amendment purposes when, pursuant to her official duties as a school nurse and within the scope of her employment, she maintained H.D.C.'s nursing notes and records. *See Wilson v. Tregre*, 787 F.3d 322, 325-26 (5th Cir. 2015) (speech not protected by the First Amendment when made within the scope of employment and pursuant to official duties).

Plaintiff stresses what she believes to be the shortcomings of Parkway's administration and BPSB, in connection with H.D.C.'s suicide, in order to emphasize that she was speaking on a matter of public concern. Without a doubt, issues of student health and safety, specifically when bullying of any sort may be involved, are objectively matters of public concern. However, Plaintiff's allegations that her involvement with H.D.C. materially affected her employment, and motivated Defendants' alleged retaliatory actions, do not rise above the level of "conclusory allegations, speculation, and unsubstantiated assertions[.]" *Douglass v. United Servs. Auto.*

---

internal quotation marks omitted)). Nonetheless, the Court does not find room for serious debate within the contours of this case. *See generally Cutler*, 767 F.3d at 472-73 (collecting cases).

17

*Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636; *Grimes v. Texas Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 139 (5th Cir. 1996).

The Fifth Circuit describes the qualified immunity analysis as a two-step process "to determine whether the certain course of conduct was objectively unreasonable as a matter of law." *Juarez v. Aguilar*, 666 F.3d 325, 331 (5th Cir. 2011). Here, taken as a whole, the evidence is simply insufficient to establish a genuine dispute that Plaintiff's First Amendment rights were violated, thereby failing to meet the first prong of the qualified immunity analysis on this claim.[44]

Even if Plaintiff's notes were entitled to First Amendment protection, and could thus survive a qualified immunity defense, her retaliation claim would fail on the merits. Plaintiff would have to prove the following four elements to establish a First Amendment retaliation claim in the employment context: "(1) the plaintiff suffered an adverse employment decision, (2) the plaintiff's speech involved a matter of public concern, (3) the plaintiff's interest in speaking outweighed the governmental defendant's interest in promoting efficiency, and (4) the protected speech motivated the defendant's conduct." *Kinney v. Weaver*, 367 F.3d 337, 356 (5th Cir. 2004). Plaintiff has failed to show that she suffered an adverse employment decision.

Adverse employment decisions include "discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999). "Transfers can constitute adverse employment actions if they are sufficiently punitive, or if the new job is markedly less prestigious and less interesting than the old one." *Breaux v. City of*

---

[44] As explained below, Plaintiff has likewise failed to establish a violation of the Fourteenth Amendment, such that Defendants are entitled to qualified immunity on that claim, as well.

18

*Garland*, 205 F.3d 150, 157 (5th Cir. 2000) (citation omitted). Plaintiff, presumably conceding that her transfer alone could not constitute an adverse employment decision in this case, alleges that she was constructively discharged.

To prove a constructive discharge, Plaintiff must show that a "reasonable person in [her] shoes would have felt compelled to resign." *Landgraf v. USI Film Products*, 968 F.2d 427, 429 (5th Cir. 1992) (quoting *Bourque v. Powell Electrical Mfg. Co.,* 617 F.2d 61, 65 (5th Cir. 1980)). Sustaining a claim of constructive discharge requires a "greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment." *Id.* at 430 (citing *Pittman v. Hattiesburg Municipal Separate School District*, 644 F.2d 1071, 1077 (5th Cir. 1981)). Essentially, Plaintiff argues that her undesirable transfer to Sun City Elementary School was a retaliatory act that, coupled with a generally hostile working environment post-March 2012, rose to the level of constructive discharge and culminated in Plaintiff's resignation in July 2013.

The Fifth Circuit has declined to expand the list of adverse employment actions "to ensure that § 1983 does not enmesh federal courts in 'relatively trivial matters.'" *Breaux*, 205 F.3d at 158 (quoting *Dorsett v. Board of Trustees*, 940 F.2d 121, 123 (5th Cir. 1991)). By way of example, "in the education context, [the Fifth Circuit] has held that decisions concerning teaching assignments, pay increases, administrative matters, and departmental procedures, while extremely important to the person who dedicated his or her life to teaching, do not rise to the level of a constitutional deprivation." *Id.* at 157 (internal citations and quotations omitted). Plaintiff's transfer, alone, clearly falls into the category of those assignments, administrative matters, and departmental procedures, which do not rise to the level of a constitutional

19

deprivation. Plaintiff offers her own subjective opinion that Sun City Elementary School was an "undesirable" assignment, and relies solely on a 2007 email, in which Plaintiff outlined her complaints and concerns during a previous placement at Sun City.[45] Those complaints included, but were not limited to: inability to hear intercom announcements; cramped, unclean office space; inability to properly screen students' hearing due to equipment noise; and no space for student cots.[46] Upon review of her complaints, the Court does not hesitate to render them "relatively trivial matters," with which federal courts should not be involved.

Furthermore, it is undisputed that neither Plaintiff's pay nor her benefits were affected by the transfer, and Defendant Hughes testified that the transfer was not a demotion, as all school assignments are equal.[47] Although equal pay is not dispositive of whether or not Plaintiff's transfer could be an adverse employment decision, "a plaintiff's subjective perception that a demotion has occurred is not enough." *Forsyth v. City of Dallas, Tex.*, 91 F.3d 769, 774 (5th Cir. 1996). Plaintiff's transfer resulted in changes to the physical locations of Plaintiff's offices and the age of the students under her medical care. Additionally, Plaintiff complains that "her working environment changed dramatically for the worse[,]" in that "she was moved from a spacious nurse's office that contained all the necessary equipment to effectively tend to students [in] a storage closet."[48] Nonetheless, even assuming that all of Plaintiff's complaints are true, the

---

[45] Doc. # 34-5, p. 90; Doc. # 34-5, pp. 32-33 (Defendant Hughes confirmed having personally seen the email prior to her deposition, despite the fact that it was sent to one "Vicky Holley," who Ms. Hughes believes to have previously been an assistant principal).

[46] Doc. # 34-5, p. 90.

[47] Doc. #53-1, p. 15 ("Although [Plaintiff's] pay and benefits stayed the same, the school was an undesirable posting because of the location of the nurse's office[.]"); Doc. # 34-5, p. 52.

[48] *Id.* at p. 27.

record reflects that she suffered no change in job title, duties, responsibilities, pay, or benefits.

Broadening the analysis to properly encompass all of Plaintiff's allegations, stretching in time from the March 2012 subpoena discussions to Plaintiff's July 2013 resignation, the Court is convinced that Plaintiff has failed to show that a reasonable person in her shoes would have felt compelled to resign. Essentially, Plaintiff alleges that Principal Bourgeois' demeanor changed after the March 2012 meeting. Both the principal and her secretary, Ms. Barger, are alleged to have exhibited hostile and harassing behavior toward the Plaintiff. The first incident occurred in August 2012, when Plaintiff confronted Ms. Barger over alleged violations, and an inappropriate scene unfolded. Both participants were counseled by Principal Bourgeois, and a meeting followed. Plaintiff expressed disagreement, however well-founded, with the administration. Thereafter, Ms. Barger was no longer employed by Parkway, and there were no further incidents until January 2013. At that time, Plaintiff was again in disagreement with the administration's decisions, believing them to be irresponsible and potentially unlawful, and she initiated a confrontation with Principal Bourgeois. Plaintiff admits that she left this meeting in disbelief of the principal's actions, while Defendants allege that she left upset, loudly declaring "this is fantastic!"[49] As a result of this incident, Plaintiff was again counseled, and ultimately reprimanded and transferred to a new school assignment.

Without minimizing H.D.C.'s nursing record or its potential relevance to any litigation surrounding the circumstances of her death, there is no objective indication that Nurse Rayborn's records, as they pertained to H.D.C., played any material role in her resignation, or alleged constructive discharge. Ms. Hughes testified that the reason for the transfer was "[t]o defuse the

---

[49] Doc. # 53-8, p. 4, ¶ 23; Doc. # 34-4, p. 4, ¶ 23.

temperament that [Nurse Rayborn] was displaying with the administration and staff at Parkway."[50] Plaintiff does not dispute that the August 2012 and January 2013 confrontational meetings occurred, nor does she dispute that Ms. Hughes' inability to condone insubordination was cited as the reason for her transfer. Although there is some dispute surrounding the various interactions, and potential personality conflicts at play, between Plaintiff and the Parkway administration, the there is no genuine dispute as to any material fact. The evidence before the Court does not support a finding that Plaintiff was objectively compelled to resign; therefore, Plaintiff cannot sustain a First Amendment retaliation claim.

Plaintiff has also invoked Fourteenth Amendment protection of her "good name, reputation, and integrity."[51] "[D]ischarge from public employment under circumstances that put the employee's reputation, honor, or integrity at stake gives rise to a liberty interest under the Fourteenth Amendment to a procedural opportunity to clear one's name." *Rosenstein v. City of Dallas*, 876 F.2d 392, 395 (5th Cir. 1989), *modified in part on other grounds*, 901 F.2d 61 (5th Cir. 1990) (per curiam).[52] Importantly, "reputation alone [is not] a constitutionally protected

---

[50] Doc. # 34-5, p. 39. Principal Bourgeois disclaims any direct involvement in Nurse Rayborn's transfer. Although she assumed that it might have been related to the 911 incident in January 2013, she claims that the only reason for the transfer, of which she was aware, was to "best meet the needs of the district." [Doc. # 34-9, pp. 44-45]. Overall, Principal Bourgeois recounts only two incidents during Nurse Rayborn's tenure, during which she believes Nurse Rayborn acted unprofessionally, and those were the August 2012 and January 2013 incidents. [Doc. # 34-9, pp. 17-18].

[51] Doc. # 53-1, p. 24.

[52] The Fifth Circuit has held that a plaintiff cannot bring a § 1983 claim related to termination from public employment unless she can prove that she had an established property interest in the employment. *Lollar v. Baker*, 196 F.3d 603, 606 (5th Cir. 1999). Beyond claiming a "right to public employment," Plaintiff makes no argument in favor of an alleged "property interest" nor does she challenge the presumption that she is an at-will employee. *See* La. Civ. Code 2747; *Guillory v. St. Landry Parish Police Jury*, 802 F.2d 822, 825 (5th Cir. 1986); and *Wallace v. Shreve Mem'l Library*, 79 F.3d 427, 429 (5th Cir. 1996). As such, her Fourteenth Amendment claims are limited to liberty interests.

interest[.]" *Wells v. Hico Indep. Sch. Dist.*, 736 F.2d 243, 256 (5th Cir. 1984). To succeed on such a claim, Plaintiff must show: (1) that she was discharged; (2) that stigmatizing charges were made against her in connection with the discharge; (3) that the charges were false; (4) that she was not provided notice or an opportunity to be heard prior to discharge; (5) that the charges were made public; (6) that she requested a hearing to clear her name; and (7) that the employer refused her request for a hearing. *Hughes v. City of Garland*, 204 F.3d 223, 226 (5th Cir. 2000).

Plaintiff simply, and clearly, cannot meet her burden on this claim. As explained above, Plaintiff was not discharged. Further, Plaintiff has not created a genuine dispute surrounding any issue of notice or opportunity to be heard, nor is there any evidence to suggest that false and/or stigmatizing charges were made or that a name-clearing hearing was requested and denied. There is no evidence, beyond Plaintiff's conclusory allegations, that Defendants either placed Plaintiff's reputation, honor, or integrity at stake, or caused any damage thereto. None of the above-listed seven elements of a Fourteenth Amendment claim have been established.

In addition to the alleged constitutional violations, Plaintiff has made two state law claims. When a district court dismisses all federal claims in a lawsuit, "the court generally retains discretion to exercise supplemental jurisdiction, pursuant to § 1367, over pendent state-law claims." *Del–Ray Battery Co. v. Douglas Battery Co.*, 635 F.3d 725, 731 (5th Cir. 2011).

Plaintiff seeks relief, pursuant to Louisiana Revised Statutes § 23:967, alleging that BPSB acted in "reprisal" for Nurse Rayborn's "whistle-blowing and protected activities," by "effectively demoting [her] by taking away the majority of her duties, transferring her, issuing baseless reprimands [which] affected her pay and promotion opportunities, harassing her,

reassigning her to an undesirable position[, and] constructively discharging her."[53] Analysis of this claim is governed by the familiar *McDonnell Douglas* framework, pursuant to which Plaintiff would have to show, *inter alia*, that she suffered an adverse employment action. *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 805 (5th Cir. 2007); *see also King v. Phelps Dunbar, LLP*, 98-1805, p. 7 (La. 6/4/99); 743 So.2d 181, 187. Accordingly, this claim fails for the reasons set forth above.

And, finally, Plaintiff alleges that Defendants' behavior caused her severe emotional distress, constituting intentional infliction of emotional distress, *see White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991) (affirming the viability in Louisiana of a cause of action for intentional infliction of emotional distress). In order to recover for the intentional infliction of emotional distress under Louisiana law, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his or her conduct. *Glenn v. Boy Scouts of Am.*, 977 F. Supp. 786, 788-89 (W.D. La. 1997) (citing *White, supra*). If there is not a genuine issue for trial on any one of the above required elements, then summary judgment is appropriate. *Id.*

In her brief, Plaintiff relies on the totality of facts as evidence that she "was subjected to a hostile working environment, baselessly reprimanded, and ultimately reassigned to [a] highly undesirable work location and banned from returning to Parkway's campus unless accompanied

---

[53] Doc. # 1, pp. 12-13, ¶¶ 35-37. Despite Plaintiff's unsupported claim that the transfer "affected her pay and promotion activities," it is undisputed that Plaintiff's pay and benefits stayed the same.

by an escort."[54] She argues that Defendants knew or should have known that their actions were

substantially likely to cause emotional distress, when they took no efforts to alleviate the

complained-of issues or conduct any investigation into her allegations of mistreatment and legal

violations at Parkway High School. She further argues that she was "shocked and surprised" by

the "Defendants' decision[s] to take issue with the red flags that were present in her nurse's

notes concerning H.D.C., ignore reports of legal violations, both past and continuing, and child

endangerment, safety and welfare issues," and then subject her to "actions intended to silence her

and marginalize her concerns[.]"[55] As a result of Defendants' alleged behavior, Plaintiff claims

to have suffered from fibromyalgia, stress, anxiety, and paranoia, and has lost interest in

previously enjoyable activities. She claims to have been under the care of a doctor since 2012;

however, she admits that her doctor is a rheumatologist, and she has not seen a psychiatrist nor

does she claim to have seen any other medical professional.[56]

     The Court's assessment of the totality of the facts differs from that of Plaintiff. "Although

recognizing a cause of action for intentional infliction of emotional distress in a workplace

setting, [Louisiana's] jurisprudence has limited the cause of action to cases which involve a

pattern of deliberate, repeated harassment over a period of time." *Nicholas v. Allstate Ins. Co.*,

1999-2522 (La. 8/31/00); 765 So. 2d 1017, 1026.  "The distress suffered by the employee must

be more than a reasonable person could be expected to endure." *Id.* "Moreover, the employer's

conduct must be intended or calculated to cause severe emotional distress, not just some lesser

---

[54] Doc. # 53-1, p. 28.

[55] *Id.* at pp. 28-29.

[56] Doc. # 53-2, p. 89.

degree of fright, humiliation, embarrassment or worry." *Id.* Under Louisiana law, the facts of this case simply do not constitute intentional infliction of emotional distress. *See id.* at 1026-28 (collecting cases).

Having carefully considered the allegations in Plaintiff's complaint, as well as the arguments for and against the instant motion for summary judgment, the Court is of the impression that Plaintiff's claims are merely speculative and lack evidentiary support. The Court finds that Defendants Bourgeois and Hughes are entitled to qualified immunity, and that furthermore, Plaintiff has failed to meet her burden on any of her constitutional or state law claims, such that all Defendants are entitled to judgment as a matter of law.

## CONCLUSION

Accordingly, for the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. #34] is hereby **GRANTED**. Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE.**

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this *18* day of July, 2016.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE

26